**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

BOARD OF TRUSTEES OF THE
MUNICIPAL ELECTRIC UTILITY OF
THE CITY OF CEDAR FALLS, IOWA,

        Plaintiff,

vs.

MIRON CONSTRUCTION CO., INC.
and CONTINENTAL CASUALTY CO.,

        Defendants.

_____

MIRON CONSTRUCTION CO., INC.
and CONTINENTAL CASUALTY CO.,

        Counter Claimants,

vs.

BOARD OF TRUSTEES OF THE
MUNICIPAL ELECTRIC UTILITY OF
THE CITY OF CEDAR FALLS, IOWA.

        Counter Defendant.

No. 13-CV-2080-LRR

**ORDER**

### TABLE OF CONTENTS

*I.*     *INTRODUCTION.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.*    *PROCEDURAL HISTORY.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

III.    SUBJECT MATTER JURISDICTION ........................... 3

IV.    STANDARD OF REVIEW................................... 4

V.    FACTUAL BACKGROUND................................. 7

VI.    SUMMARY OF ARBITRATION PANEL'S FINDINGS............... 11

VII.    MOTION TO VACATE.................................. 13

    A.    "Design-Build" Method of Delivery...................... 13
        1.    Parties' arguments............................. 13
        2.    Applicable law................................ 15
        3.    Application................................... 17
    B.    Iowa public policy.................................. 21
        1.    Parties' arguments............................. 21
        2.    Applicable law................................ 21
        3.    Application................................... 22

VIII.    MOTION TO CONFIRM................................ 22

    A.    Confirmation of the Arbitration Award. ................. 23
        1.    Parties' arguments............................. 23
        2.    Analysis..................................... 23
    B.    Pre-Judgment Interest and Post-Judgment Interest.............. 25
        1.    Parties' arguments............................. 25
        2.    Analysis..................................... 26
    C.    Attorney's Fees and Costs............................ 27

IX.    CONCLUSION....................................... 27

## I.  INTRODUCTION

The matters before the court are Plaintiff and Counter Defendant Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa's ("CFU") "Motion to Confirm Arbitration Award" ("Motion to Confirm") (docket no. 12) and Defendants and Counter Claimants Miron Construction Co., Inc. ("Miron") and Continental Casualty Company's ("CNA") "Motion to Vacate Arbitration Award" ("Motion to Vacate") (docket no. 19).

## II.  PROCEDURAL HISTORY

On November 8, 2013, CFU filed a Petition in the Iowa District Court for Black

Hawk County ("Complaint") (docket no. 10), Case No. EQCV123297. On December 3, 2013, Miron and CNA removed this action on the basis of federal question jurisdiction and diversity jurisdiction. Notice of Removal (docket no. 8).

On December 6, 2013, CFU filed the Motion to Confirm. On December 9, 2013, Miron and CNA filed an Answer (docket no. 13). On December 30, 2013, Miron and CNA filed a Resistance to the Motion to Confirm (docket no. 20). On January 6, 2014, CFU filed a Reply to the Resistance to the Motion to Confirm (docket no. 21). None of the parties request oral argument on the Motion to Confirm and the court finds that oral argument is unnecessary. The Motion to Confirm is fully submitted and ready for decision.

On December 30, 2013, Miron and CNA filed the Motion to Vacate. On January 13, 2014, CFU filed a Resistance to the Motion to Vacate (docket no. 22). On January 23, 2014, Miron and CNA filed a Reply to the Resistance to the Motion to Vacate (docket no. 24). None of the parties request oral argument on the Motion to Vacate and the court finds that oral argument is unnecessary. The Motion to Vacate is fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The parties do not dispute that the court has diversity jurisdiction over the instant matter. The parties to an arbitration agreement must have an affirmative agreement providing for judicial confirmation of an arbitration award in order for a federal court to have confirmation authority under 9 U.S.C. § 9. The Contract between CFU and Miron (docket no. 12-4) provides the following:

> All claims, disputes and other matters in question between [CFU] and [Miron] arising out of or relating to the Contract . . . or the breach thereof . . . will be decided by arbitration . . . . The award rendered by the arbitrators will be final, judgment may be entered upon it in any court having jurisdiction thereof.

Contract at 80. The court is satisfied that it has diversity jurisdiction over this case because

3

complete diversity exists between the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ."). For purposes of diversity jurisdiction, CFU is a citizen of Iowa. Miron is a Wisconsin corporation with its principle place of business in Neenah, Wisconsin. CNA is an Illinois corporation with its principle place of business in Chicago, Illinois.

## IV. STANDARD OF REVIEW

The Federal Arbitration Act ("FAA") provides courts with the authority to confirm or vacate an arbitration award:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made.

9 U.S.C. § 9. 9 U.S.C. § 10 provides the "exclusive ground[]" for vacating an arbitration award. *Hall Street Assocs. v. Mattel, Inc.*, 552 U.S. 576, 584 (2008). Section 10(a) provides:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> (1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

A court's review of a motion to vacate an arbitration award is limited to the grounds listed in § 10. "Congress did not authorize *de novo* review of [an arbitration] award on its merits; it commanded that when the exceptions do not apply, a federal court has no choice but confirm." *UHC Mgmt. Co., v. Computer Scis. Corp.*, 148 F.3d 992, 997 (8th Cir. 1998). "[R]eview of an arbitration award under the Federal Arbitration Act is exceedingly limited and deferential." *St. John's Mercy Med. Ctr. v. Delfino*, 414 F.3d 882, 884 (8th Cir. 2005). A court may not "reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987); *accord Med. Shoppe Int'l, Inc. v. Turner Inv., Inc.*, 614 F.3d 485, 488 (8th Cir. 2010) ("Courts have no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract."). "'The district court affords the arbitrator's decisions an extraordinary level of deference and confirms so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.'" *Wells Fargo Bank, N.A. v. WMR e-PIN, LLC*, 653 F.3d 702, 710 (8th Cir. 2011) (quoting *Crawford Grp., Inc. v. Holekamp*, 543 F.3d 971, 976 (8th Cir. 2008)); *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,

559 U.S. 662, 671 (2010) ("It is not enough for petitioners to show that the [arbitration] panel committed an error—or even a serious error."); *McGrann v. First Albany Corp.*, 424 F.3d 743, 748 (8th Cir. 2005) ("The bottom line is '[w]e will confirm the arbitrator's award even if we are convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority.'" (alteration in original) (quoting *Schoch v. InfoUSA, Inc.*, 341 F.3d 785, 788 (8th Cir. 2003))); *Ace Elec. Contractors, Inc. v. International Brotherhood of Electrical Workers, Local Union No. 292*, 414 F.3d 896, 899 (8th Cir. 2005) ("Where the parties have contemplated that an arbitrator will give meaning to the language of the contract and determine the remedies for the violations it finds, 'courts have no authority to disagree with [the arbitrator's] honest judgment' and a court may not reject an arbitrator's fact-findings or interpretation of contract 'simply because it disagrees with them.'" (alteration in original) (quoting *United Paperworkers International Union*, 484 U.S. at 38)); *Inter-City Gas Corp. v. Boise Cascade Corp.*, 845 F.2d 184, 187 (8th Cir. 1988) (providing that "contract interpretation is left to the arbitrator").

Section 10(a)(4) of the FAA allows a district court to vacate an arbitration decision "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). However, "[a] party seeking relief under [9 U.S.C. § 10(a)(4)] bears a heavy burden." *Oxford Health Plans LLC v. Sutter*, __ U.S. __, __, 133 S. Ct. 2064, 2068 (2013). "[C]onvincing a court of an arbitrator's error—even his grave error—is not enough" for a court to vacate an arbitration decision. *Id.* at 2070. "So long as the arbitrator was 'arguably construing' the contract . . . a court may not correct his mistakes under § 10(a)(4)." *Id.* (quoting *E. Associated Coal Corp. v. United Mine Workers of America, District 17*, 531 U.S. 57, 62 (2000)). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." *Stolt-Nielsen S.A.*, 559 U.S. at 671 (alterations in original)

(quoting *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001)) (internal quotation marks omitted). "The potential for those mistakes is the price of agreeing to arbitration." *Oxford Health Plans LLC*, __ U.S. __, 133 S. Ct. at 2070. "'It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.'" *Id.* (alteration in original) (quoting *United Steelworkers of America v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599 (1960)).

## V. FACTUAL BACKGROUND

The court accepts the arbitration panel's findings of facts. *See* Arbitration Award (docket no. 12-3) at 1-5. The facts of this case are summarized as follows:

The underlying dispute arises from a project to furnish a new filter system for the exhaust-gas stream from a stoker-fired boiler (Unit #6) ("the project"). CFU entered into a contract with Brown Engineering Co. ("Brown") on April 13, 2005, for Brown to "provide professional services relating to the engineering design and construction management involved in a project to install a fabric filter (baghouse) on Streeter Unit 6." Cedar Falls Utilities Professional Services Agreement (docket no. 19-5) at 1.

In 2006, CFU initiated public bidding for a contractor to build the project. Miron submitted a bid that included a proposal from Dustex, its subcontractor. On August 10, 2006, based on the drawings and specifications that Brown created, CFU entered into the Contract with Miron to complete the project for a price of $3,350,000. Arbitration Award at 2. The Contract provides that Miron, referred to as CONTRACTOR in the Contract, shall

> complete all Work as specified in the Contract Documents. The Work is generally described as follows: streeter station unit no. 6 environmental upgrade—fabric type dust collector addition[.]

Contract at 1 (emphasis omitted). In addition, the Contract states:

> The Project has been designed by the engineering staff of
> Brown Engineering Company, Des Moines, Iowa, who are
> hereinafter called ENGINEER and who assumes all duties and
> responsibilities and have the rights and authority assigned to
> ENGINEER in the Contract Documents in connection with
> completion of the Work in accordance with the Contract
> Documents.

*Id.* at 1. The Contract Documents "comprise the entire agreement" between CFU and Miron, consisting of the eleven items enumerated in the Contract. *Id.* at 4.

The Contract Documents also provide for the resolution of "[a]ll claims, disputes and other matters in question between [CFU] and [Miron] arising out of or relating to the Contract Documents or the breach thereof" to be "decided by arbitration." *Id.* at 80. Additionally, "[t]he award rendered by the arbitrators will be final, judgment may be entered upon it in any court having jurisdiction thereof, and it will not be subject to modification or appeal." *Id.*

On February 2, 2007, Miron and Dustex entered into a Purchase Agreement for Dustex's work on the project. Purchase Agreement (docket no. 12-5). Dustex agreed to contract the critical component of the filter system, the dust collection "baghouse," which is a series of hundreds of sixteen-inch, tube-shaped filters housed in four steel modules. The baghouse system includes a sophisticated, automated air system to pulse clean subsets of bag filters while the balance remains in operation. Dustex sized the components of the proprietary filter system based on a performance specification contained in the Contract Documents. In addition, Dustex elected to produce a bottom-flow, rather than a cross-flow, design for the pulse-cleaning system. When the filter bags clog with ash, the upstream exhaust steam pressure increases until it reaches levels unsafe for boiler operation and shuts down the boiler and associated generator. The effectiveness of a fixed filter area is dependent on several factors, including the volume of exhaust gas that must be processed per minute of operation.

The Contract Documents set forth the design parameters for the system and anticipated four equally sized filter modules, one of which was designated as a spare to allow for off-line maintenance and cleaning. The Contract required capacity for any three modules to accommodate the gas volume anticipated by CFU as provided for in the Contract Documents. In addition, the Contract Documents required Miron to size all equipment in the system, including the baghouse, for a maximum flue-gas flow rate of 93,000 actual cubic feet per minute ("ACFM"). The Contract Documents also required Miron to guarantee baghouse performance based on specific fuel, inlet dust loading and a flue-gas flow of 80,000 ACFM at 350 degrees Fahrenheit. The baghouse was required to operate under those conditions with a maximum draft loss, or differential pressure, of six inches w.g. (water gauge) before cleaning and at 99% particulate collection efficiency. The Contract Documents further required Miron to hire a third party to conduct performance tests of the system after thirty days or more of continuous operation of the baghouse. There is no evidence that Miron ever hired a third party to conduct such testing and no performance test was ever run after thirty continuous days of baghouse operation.

In the Purchase Agreement, Dustex intended and agreed that it would satisfy the performance guarantee included in the Purchase Agreement with three modules on line and a fourth module serving as a spare.

The project was completed in the summer of 2007, however, it has never operated to CFU's satisfaction. CNA underwrote a performance bond assuring Miron's performance to CFU with a penal sum of $3,350,000. Accordingly, CNA is subject to the same claims and defenses as its principal, Miron. Arbitration Award at 2.

On August 18, 2009, Miron filed a Demand for Arbitration/Mediation Form (docket no. 12-6), asserting a claim against CFU for $475,000 in damages, the unpaid amount on the Contract. On September 2, 2009, CFU filed an Answering Statement (docket no. 12-7) denying Miron's claim and asserting a counter claim for $1,461,000 in damages. On July

5, 2011, the American Arbitration Association ("AAA") sent counsel for Miron, CFU and Dustex a letter (docket no. 12-12) listing the roster of arbitrators and their resumes from which the parties could select a panel of three arbitrators and noting that, absent an agreement of the parties, "each party shall independently strike the names objected to, number the remaining names in order of preference and return the list to the [AAA]." July 5, 2011 Letter at 2. The July 5, 2011 Letter further stated that if the parties failed to reach an agreement or return the list by the deadline, "the arbitrators will be appointed as authorized in the Rules." *Id*. On October 17, 2011, the AAA sent counsel for Miron, CFU and Dustex a letter (docket no. 12-13) providing the parties with a second list of arbitrators to select from. On December 16, 2011, the AAA sent counsel for Miron, CFU and Dustex a letter (docket no. 12-14) stating that it had "appointed Jerome V. Bales, Wyatt A. Hoch, and Marshall P. Young as arbitrators." December 16, 2011 Letter at 1. In addition, the December 16, 2011 Letter directed the parties to "advise the [AAA] of any objections to the appointment of" the arbitrators. *Id*. No party objected to the appointment of the arbitrators at any point during the proceedings.

On May 15, 2012, CFU filed a Second Amended Statement of Claims (docket no. 12-19) seeking damages in "an amount in excess of $2,000,000," as well as liquidated damages. Second Amended Statement of Claims at 5. On December 7, 2012, CFU filed a Third Amended Statement of Claims (docket no. 12-26) seeking damages "in an amount in excess of $6,500,000," as well as liquidated damages. Third Amended Statement of Claims at 5. The arbitration hearing began on January 21, 2013, and the panel heard evidence from January 21 through January 25, 2013; January 28 through January 29, 2013; April 21 through April 23, 2013 and August 26 through August 27, 2013. CFU submitted a Post-Hearing Brief on October 8, 2013 (docket no. 12-41). On that same date, Miron and CNA also submitted a Post-Hearing Brief (docket no. 12-42).

## VI.  SUMMARY OF ARBITRATION PANEL'S FINDINGS

On November 6, 2013, a panel of three arbitrators with the AAA issued an Arbitration Award in favor of CFU.  The panel made the following findings:

First, with respect to CFU's claims against Miron, the panel found Miron liable to CFU for $274,053.17 in liquidated damages and $33,439.63 for automation of the ash conveyancing system. In addition, the panel found that Dustex, Miron's subcontractor, intended and agreed to install four equally sized filter modules, one of which was designated as a spare to allow for off-line maintenance and cleaning.  Second, the panel found that Miron breached the Contract with CFU because: (1) Dustex sized the baghouse for a gas flow rate of 80,000 ACFM, below the 93,000 ACFM rate that the Contract required; and (2) Dustex admitted that the baghouse as installed needed to operate with all four modules on-line, rather than with three and one spare, to comply with the Contract. Third, the panel found that Miron breached an express warranty in the Contract that "all Work will be in accordance with the Contract Documents and will not be defective," Contract at 65 (emphasis omitted), and is liable to CFU pursuant to this alternative theory. Finally, the panel found that Miron is entitled to a credit from CFU for the $420,872.96, the unpaid balance on the Contract.

Next, the panel addressed CFU's claims against Dustex.  First, the panel found that CFU is an intended third-party beneficiary of the Purchase Agreement between Miron and Dustex.  The panel found that Dustex breached the Purchase Agreement because the baghouse that it installed did not conform with the specifications set forth in the Contract. Second, the panel found that CFU is entitled to damages against Dustex because Dustex breached the indemnification provision of the Purchase Agreement and the indemnification provision of the Contract that was incorporated into the Purchase Agreement, which requires Dustex to indemnify CFU.  The Purchase Agreement includes an indemnification provision that provides:

> To the fullest extent permitted by law, [Dustex] agrees to hold harmless and defend [CFU] and Miron . . . from any and all claims, demands, and judgments, including attorney's fees, and to indemnify and reimburse [CFU] and Miron . . . for any and all expenses, damage, or liability incurred by [CFU] or Miron . . . , whether directly or indirectly caused in whole or in part by [Dustex], on account of or in connection with any material furnished by [Dustex] under this [Purchase] Agreement, or by any person, firm, or corporation to whom any portion of the material is let or sublet by [Dustex].

Purchase Agreement at 9. The Contract, incorporated into the Purchase Agreement by reference, also requires Dustex to indemnify CFU for all "claims, costs, losses and damages" resulting from any defective work. Contract at 74. These costs include "all fees and charges of engineers, architects, attorneys and other professionals and all court or arbitration or other dispute resolution costs." *Id.* at 79. Accordingly, the panel found that CFU is entitled to recover damages resulting from Dustex's breach of these indemnification provisions. The panel also found that CFU is not entitled to recover against Dustex on theories of equitable indemnity or professional negligence.

Finally, the panel provided its damages calculations. The panel found that CFU is entitled to recover the following damages from Miron and CNA: (1) $274,053.17 in liquidated damages; (2) $33,439.63 that was spent to hire another contractor to complete automation of the ash conveying system that Miron left unfinished; (3) $3,419, 697.29 to correct the baghouse; and (4) less the remaining $420,872.96 that CFU did not pay Miron under the Contract, resulting in a total damages amount of $3,306,317.13. The panel found that CFU is entitled to recover from Dustex, jointly and severally with Miron and CNA, $3,419,697.29 to correct the baghouse. Finally, the panel held that Miron and Dustex must pay $171,114.88 for the AAA's fees and expenses and $23,350.00 for the AAA's administrative fees and expenses. The panel provided that Miron, Dustex and CNA must pay the award within ten days after the date that the last arbitrator signed the Arbitration

Award, which was on November 6, 2013.

## VII.  MOTION TO VACATE

At the outset, the court notes that it "ha[s] no authority to reconsider the merits of an arbitration award, even when the parties allege that the award rests on factual errors or on a misinterpretation of the underlying contract." *Med. Shoppe Int'l, Inc.*, 614 F.3d at 488.  Rather, as discussed above, the court may only vacate the Arbitration Award for the reasons enumerated in 9 U.S.C. § 10.  Miron and CNA assert that the court should vacate the Arbitration Award pursuant to 9 U.S.C. § 10(4), which provides that the court may vacate an award "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," 9 U.S.C. § 10(4), and because the Arbitration Award violates Iowa public policy. The court shall address each argument in turn.

### A.  "Design-Build" Method of Delivery

#### 1.    Parties' arguments

In the Motion to Vacate, Miron and CNA contend that the court should vacate the Arbitration Award because, "[b]y finding Miron and Dustex responsible for the design of the baghouse, the [p]anel created a new method of delivery for a public project in Iowa—'design-build'—in express violation of Iowa law."  Brief in Support of Motion to Vacate (docket no. 19-1) at 18.  According to Miron and CNA, the Arbitration Award interprets the Contract Documents to impermissibly permit a design-build method of delivery and holds Miron and Dustex responsible for designing the baghouse, in violation of Iowa law, which only permits a design-bid-build method of delivery for public projects. Thus, Miron and CNA assert that the arbitrators exceeded their powers by "creat[ing] new legal rights and liabilities that do not actually exist under the operative law."  *Id.*  Miron and CNA claim that the panel "created a new element of Iowa law in its [Arbitration] Award—a 'design-build' public contract" and the "sanctioning of a 'design-build' delivery

13

system in Iowa public contracts is a matter for the Iowa legislature to decide." *Id.* at 20. Accordingly, Miron and CNA claim that the court should vacate the Arbitration Award pursuant to 9 U.S.C. § 10(a)(4).

In further support of this argument, Miron and Dustex point to CFU's Post-Hearing Brief, which CFU filed with the panel on October 8, 2013. In the Post-Hearing Brief, CFU argues that Miron *was* responsible for designing the baghouse. *See* CFU Post-Hearing Brief at 9 ("The plans and specifications left the detailed design to be performed by the contractors, subject to the requirements of Performance Guarantees and Performance Testing. The contractors had to design a turnkey system for the boiler operating at its rated capacity on coal."). In the Motion to Vacate, Miron and CNA assert that Miron and Dustex "consistently" argued that they were not responsible for designing the baghouse and that "Iowa law does not allow a 'design build' public contract." Brief in Support of the Motion to Vacate at 17. However, Miron and CNA opine that the panel "accepted CFU's position without explanation" and found that Miron "did not size the baghouse to meet CFU's needs." *Id.* at 17-18 (citing Arbitration Award at 2 (providing that the "Contract obligated Miron to design, furnish, and install a complete turnkey fabric filter type dust collection system" and "to size all equipment in the system")).

In the Resistance to the Motion to Vacate, CFU argues that the court should deny the Motion to Vacate for the following reasons. First, CFU contends that Miron and CNA's argument that the panel's interpretation of the Contract Documents is in violation of Iowa law, which only permits a design-bid-build method of delivery for public projects, is seeking "a review for legal errors or mistakes" and "[s]uch review [of an arbitration decision] is not appropriate" and is not grounds to vacate. Resistance to the Motion to Vacate at 7. Second, CFU argues that the project was in fact a design-bid-build project in line with Iowa law and that imposing performance specifications on Miron and Dustex is permissible. Third, CFU argues that the language in the Arbitration Award finding that the

Contract "obligated Miron to design, furnish, and install a complete turnkey fabric filter type dust collection system" is not essential to the panel's finding that Miron breached its contractual duties to CFU. Resistance to the Motion to Vacate at 13 (quoting Arbitration Award at 3). Fourth, CFU contends that even if the Contract did violate Iowa law, such violation does not invalidate the Contract because neither Miron nor CFU sought avoidance and the Contract substantially complies with Iowa's competitive bidding law. Fifth, CFU contends that Miron and CNA waived any argument that the Contract is void because it violates Iowa law because they did not raise this argument to the panel.

## 2. *Applicable law*

Iowa code section 26.3, titled "Competitive bids for public improvement contracts," provides that "[a] governmental entity shall have an engineer . . . [or] architect . . . prepare plans and specifications . . . of a proposed public improvement. A governmental entity shall ensure that a sufficient number of paper copies of the project's contract documents . . . are made available for distribution . . . to prospective bidders." Iowa Code § 26.3. Thus, under Iowa law, a design-build delivery method is not permitted. Rather, Iowa law requires a design-bid-build method of delivery. *See* 1994 Iowa Op. Atty. Gen. 95 (94-4-2), 1994 WL 168405, at *2 (April 5, 1994) (concluding that "soliciting a package bid to both design and build [a public project] is not authorized and would be contrary to the public bidding process"). The law on competitive bidding in Iowa is summarized as follows:

> Public authorities cannot lawfully ask each bidder to make his own plans and specifications and to base his bid thereon, and then, after the bids are received, adopt one of the offered plans with its specifications and accept the accompanying bid. Such a procedure would be destructive of competitive bidding and would give public officials an opportunity to exercise favoritism in awarding contracts. A contract cannot be said to have been let to the lowest and best bidder unless all bidders have been invited to bid upon the same specification.

*Id.* at *2.

In *Northwestern Light & Power Co. v. Town of Grundy Center*, 261 N.W. 604 (Iowa 1935), the Iowa Supreme Court upheld the lower court's holding that a contract between the Town of Grundy Center and the successful bidder was void because a proper competitive bidding process did not take place and Iowa's competitive bidding laws were not complied with. *Id.* at 610. The Iowa Supreme Court stated that

> [w]hatever element enters into the competitive scheme, it should be the same for all, not left for each bidder to fix for himself, and thereby estimate his bid upon a basis different from that of any other bid. The general vice of such a course is that no common standard for competition is set up.

*Id.* at 609 (citing *Johnson v. Atlantic City*, 85 N.J. L. 145 (N.J. 1913)). In that case, the successful bidder of the project prepared plans and specifications for the project that "were so indefinite, sketchy, and lacking in detail as to furnish no common basis for the submission of competitive bids." *Id.* at 608. The Iowa Supreme Court noted that

> the law contemplates that the proposed plans and specifications . . . should be prepared by a disinterested competent engineer . . . , that these plans and specifications should be on file, available for inspection by interested parties and by all bidders for the requisite length of time required by law, and that they should be sufficiently specific with reference to established and recognized standards as to enable all bidders to bid upon the same identical proposition.

*Id.* at 609-10. The court stated that the purpose of the law "is to secure economy, to prevent fraud, favoritism, and extravagance, so that all bidders will be on the same basis in matters material to the proposed municipal action." *Id.* at 609. Thus, the Iowa Supreme Court found that "it was manifestly unfair, not only to the bidders, but to the town, to turn the whole matter of preparing plans and specifications and form of contract over to the agent of one of the principal bidders, and in this instance the successful bidder." *Id.* at 610.

16

### *3.    Application*

Miron and CNA rely on the Iowa Supreme Court's holding in *Northwestern Light & Power Co.* to support their contention that the arbitrators exceeded their powers because their decision undermines Iowa's public bidding laws by sanctioning a design-build method of delivery for an Iowa public contract.  The court finds that the facts of *Northwestern Light & Power Co.* are distinguishable from those in the instant case.  First, CFU held a public bidding process based on the drawings and specifications that Brown created and three contractors bid on the project.  Thus, unlike in *Northwestern Light & Power Co.*, CFU did not "turn the whole matter of preparing plans and specifications over to" Miron.  *Id.*  The issue here is not whether there was a bidding process on designs prepared by a third-party engineer.[1]  Rather, the issue is whether, in holding Miron responsible for certain performance standards and design specifications, as provided for in the Contract, the Arbitration Award impermissibly sanctioned a design-build method of delivery for a public

---

[1] There is no allegation that the plans that Miron bid on "were so indefinite, sketchy, and lacking in detail as to furnish no common basis for the submission of competitive bids."  *Id.* at 608.  However, according to Miron and CNA's claims, it follows that no bid based on Brown's designs would be enforceable because some design specifications were left to the contractor.  Although Miron and CNA argue, both now and before the panel, that the Contract should be interpreted in light of Iowa's public bidding laws, they contend that the Contract is *not* void.  *See* Reply to the Resistance to the Motion to Vacate at 4.  Such argument would be inconsistent with Miron's initial argument to the panel, as Miron initiated the arbitration proceedings to collect the remainder owed from CFU on the Contract.  Thus, the court cannot consider, and Miron and CNA do not ask the court to consider, whether the panel should have found that the Contract is void.  *See Med. Shoppe Int'l, Inc.*, 614 F.3d at 489 ("When a party 'who contests the merits of an arbitration award in court fails to first present the challenges on the merits to the arbitrators themselves, review is compressed still further, to nil.'" (quoting *International Brotherhood of Electrical Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1101 (8th Cir. 2004)).

contract.[2]

Furthermore, in *Northwestern Light & Power Co.*, the winning bidder had an unfair advantage because it prepared the plans and specifications and "through [the winning bidder's] interviews with the mayor and city council, had obtained inside information as to just what was desired." *Id.* at 610. Such is not the case in the instant matter. Rather, Miron submitted the winning bid for the project and was hired to construct the project according to the specifications in the Contract Documents prepared by Brown. Miron and CNA now assert that the panel's decision in the Arbitration Award holds Miron responsible for designing the project, rather than merely constructing the project pursuant to the Contract Documents, and such holding subverts Iowa law's requirement of a design-bid-build method of delivery for public contracts and effectively provides for a design-build method of delivery. However, the court finds that the panel did not transform the bidding process that actually took place into a design-build method of delivery by enforcing the design specifications and performance standards left to Miron's discretion in the Contract. As Miron and CNA point out in their brief, a design-build method "combines multiple steps of the project into a single phase, with a single contract, with a single entity." Brief in Support of Motion to Vacate at 10. Here, there are two contracts, one between CFU and Brown, and another, separate contract between CFU and Miron. Further, Miron did not furnish its own revised plans and specifications, and does not contend that it did. Brown

_____

[2] Miron and CNA state that "Miron and CNA agree that the Project, in fact, was a design-bid-build project, consistent with Iowa law. . . . The problem is that *after the fact*, CFU contended in the arbitration that Miron and . . . Dustex . . .were responsible for the design," rather than Brown. Reply to the Resistance to the Motion to Vacate at 2. However, the Contract itself left certain design specifications to Miron and included performance standards, including the precise language in the Arbitration Award that Miron and CNA take issue with: "It is intended that the Contractor [Miron] shall design, furnish, and install a complete turnkey fabric filter type dust collection system on the flue gas discharge of Unit No. 6 to meet the desired capacities and operating conditions." Contract at 97.

left certain design specifications and performance standards to the contractor and winning bidder, Miron. Nothing in the case law that Miron and CFU rely on indicates that enforcing such requirements is impermissible pursuant to Iowa law.

Miron and CNA also point to *Condon-Cunningham, Inc. v. Day*, 22 Ohio Misc. 71 (Ohio Ct. Com. Pl. 1969), where the Court of Common Pleas of Ohio held that a contractor is not liable for defects in the plans and specifications that it was hired to construct, *id.* at 272, to support their argument that they are not liable for an allegedly defective baghouse design. However, the issue here is not whether Miron can be held liable for design errors in Brown's plans, it is whether Brown's plans can permissibly leave certain design specifications and performance standards to Miron and whether Miron can be held responsible for the specifications and standards left to its discretion under the Contract. Thus, the court is not persuaded by *Condon-Cunningham, Inc.*

Miron and CNA take issue with the panel's statement in the Arbitration Award that the Contract required "Miron to design, furnish, and install a complete turnkey fabric filter type dust collection system" and to "size all equipment in the system—including the baghouse—for a maximum flue-gas flow rate of 93,000 [ACFM]" and with the Panel's ultimate finding that Miron is liable, in part, because it did not properly size the baghouse to meet CFU's needs. Arbitration Award at 3. However, Miron and CNA have not pointed to any law in support of their argument that either Brown or CFU were prohibited from leaving certain design specifications to Miron or that leaving certain design specifications to a contractor transforms a design-bid-build delivery process into a design-build delivery process. Accordingly, the court is not persuaded that the Arbitration Award sanctions a design-build method of delivery of public contracts.

In light of the foregoing, the court finds that the panel did not "exceed their powers" pursuant to 9 U.S.C. § 10(4). Although the panel did not go into great detail with respect to Miron and CNA's argument that the interpretation of the Contract that CFU advocated

for would permit a design-build method of delivery contrary to Iowa law, it appears that the panel found that providing performance standards and some design specifications to Miron was permissible and enforcing such standards and specifications did not transform the bidding process into a design-build method of delivery. Furthermore, the court finds that the Arbitration Award is *at least* "arguably construing or applying" the Contract. *Wells Fargo Bank, N.A.*, 653 F.3d at 710; *see also* Contract at 97 ("It is intended that the Contractor [Miron] shall design, furnish, and install a complete turnkey fabric filter type dust collection system on the flue gas discharge of Unit No. 6 to meet the desired capacities and operating conditions."). It cannot be said that the panel strayed from the interpretation and application of the Contract, effectively dispensing their "own brand of industrial justice." *Stolt-Nielsen S.A.*, 559 U.S. at 671 (quoting *Major League Baseball Players Ass'n*, 532 U.S. at 509) (internal quotation mark omitted); *see also Oxford Health Plans LLC*, __ U.S. at __, 133 S.Ct. at 2070 (stating that "convincing a court of an arbitrator's error—even his grave error—is not enough" for a court to vacate an arbitration decision). Even if the court were to find that the panel "committed an error—or even a serious error," the court must nonetheless affirm the Arbitration Award. *Stolt-Nielsen S.A.*, 559 U.S. at 671. Thus, the court finds that vacatur is not warranted.[3] Accordingly, the court shall

---

[3] The court notes that CFU provided additional support for its argument that it is permissible for an engineer to require the contractor to complete some design of a project. *See* Resistance to Motion to Vacate at 9-13; *see also id.* at 9-10 ("It is unrealistic to expect that structures of any complexity can be 100% designed prior to seeking bids from contractors. . . . Construction contracts, both in the private and the public domain, commonly provide for the contractor to deliver the design and construction of such engineered systems." (quoting 2 Bruner & O'Connor Construction Law § 6.24 (2013))); *id.* at 10 ("A common method by which owners design responsibility to contractors is to create performance specifications . . . [which] set forth what the owner ultimately wants to achieve in the way of an end-product without providing specific design information instructing the contractor on how to achieve the desired result." (quoting 2 Bruner & O'Connor Construction Law § 6.26 (2013))).

deny the Motion to Vacate to the extent it requests that the court vacate the Arbitration Award pursuant to 9 U.S.C. §10(a)(4).

## B. *Iowa Public Policy*

### 1. *Parties' arguments*

Miron and CNA contend that the court should vacate the Arbitration Award because it undermines the purpose and public policy behind public bidding laws in Iowa. CFU argues that Iowa public policy does not preclude enforcement of the Arbitration Award. In support of its argument, CFU contends that: (1) the bidding process did not violate Iowa's public bidding laws; (2) the public policy behind Iowa's public bidding laws is to "protect the public as taxpayers" and such policy does not support vacatur of the Arbitration Award; and (3) because Miron and CNA did not make a public policy argument to the panel, they waived it. Resistance to the Motion to Vacate at 18-19 (quoting *Master Builders of Iowa, Inc. v. Polk Cnty.*, 653 N.W.2d 382, 394 (Iowa 2002)).

### 2. *Applicable law*

The court may not enforce a contract "that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, International Union of Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 766 (1983). If a contract, as interpreted by an arbitrator or arbitration panel "violates some explicit public policy, [the court is] obliged to refrain from enforcing it." *Id.* "Such a public policy, however, must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Id.* (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)). Thus, although the court must afford an arbitration panel's decision great deference, the court may not enforce a contract "that is contrary to public policy." *Ace Elec. Contractors, Inc.*, 414 F.3d at 900 (quoting *W.R. Grace & Co.*, 461 U.S. at 766); *Williams v. Nat'l Football League*, 582 F.3d 863, 884 (8th Cir. 2009) ("'If the [Policy] as interpreted by [the arbitrator] violates some explicit public policy,

21

[courts] are obliged to refrain from enforcing it.'" (alterations in original) (quoting *W.R. Grace & Co.*, 461 U.S. at 766)).

### 3. *Application*

The court assumes, arguendo, that Iowa has a "well defined and dominant" public policy to enforce a design-bid-build method of delivery for public projects. *W.R. Grace & Co.*, 461 U.S. at 766. Nonetheless, Miron and CNA have failed to establish that enforcing the Arbitration Award "is contrary to [this] public policy." *Ace Elec. Contractors, Inc.*, 414 F.3d at 900. As discussed above, the court does not agree with Miron and CNA's argument that enforcing the Arbitration Award sanctions a design-build method of delivery for public contracts, contrary to the requirement under Iowa law that public contracts follow a design-bid-build method of delivery. For the same reasons as discussed above, the court finds that Miron and CNA's public policy argument fails as well. Furthermore, the Iowa Supreme Court has stated that "[t]he paramount purpose of the competitive bidding statute is to protect the public as taxpayers." *Master Builders of Iowa, Inc.*, 653 N.W.2d at 394. In the underlying case, CFU had designs prepared by an engineer, Brown, and engaged in a bidding process by which it received bids from three contractors. Accordingly, the "paramount purpose" of the competitive bidding statute is not compromised by enforcing the Arbitration Agreement. Accordingly, the court declines to vacate the Arbitration Award on public policy grounds and shall deny the Motion to Vacate to the extent it requests that the court vacate the Arbitration Award for this reason.

### VIII. MOTION TO CONFIRM

In the Motion to Confirm, CFU requests that the court confirm the Arbitration Award and enter judgment in favor of CFU and against Miron and CNA, jointly and severally, in the amount of $3,419,697.29. In addition, CFU requests expedited relief in the instant matter, in part, because CFU has made no modifications to the baghouse since 2007 to preclude a spoliation argument. However, "CFU must have an operational

baghouse for Unit No. 6 by January 31, 2016," to comply with federal law. In addition, CFU seeks pre-judgment interest and post-judgment interest, as well as attorney's fees and costs.

### A. Confirmation of the Arbitration Award

#### 1. Parties' arguments

In the Motion to Confirm, CFU requests that the court confirm the Arbitration Award and enter judgment in favor of CFU and against Miron and CNA, jointly and severally, in the amount of $3,419,697.29.

In the Resistance to the Motion to Confirm, Miron and CNA argue that the court should deny the Motion to Confirm because the court should vacate the Arbitration Award. In addition, Miron and CNA contend that, at most, they are only liable for $3,306,317.13 in damages, not $3,419,697.29, in light of the $420,872.96 balance remaining on the Contract, whereas Dustex is jointly and severally liable for $3,419,697.29. Accordingly, Miron and CNA contend that, "[b]ecause the entire [Arbitration] Award cannot be confirmed against Miron and CNA, and CFU elected not to make Dustex a party to this action," the court should not confirm the Arbitration Award. Resistance to the Motion to Confirm at 7 (citing Fed. R. Civ. P. 19(a)(1)).

#### 2. Analysis

As discussed above, the court has determined that there is no reason pursuant to 9 U.S.C. § 9 to vacate the Arbitration Award. Accordingly, the court finds it appropriate to confirm the Arbitration Award. However, the parties further dispute whether the court should enter judgment in favor of CFU and against Miron and CNA, jointly and severally, for $3,306,317.13 or $3,419,697.29. In the "Summary of CFU's Damages" section in the Arbitration Award, the panel states that CFU is entitled to the following damages from Miron and CNA:

| | |
|---|---|
| Liquidated Damages | $274,053.17 |
| Ash Conveying System Automation | $33,439.63 |

| | |
|---|---|
| Cost to Correct Baghouse | $3,419,697.29 |
| (less) . . . Contract Balance | ($420,872.96) |

Arbitration Award at 10. In light of the figures above, Miron and CNA assert that the court cannot enter a judgment against them in excess of $3,306,317.13. The Arbitration Award further provides that CFU is entitled to damages from Dustex, jointly and severally with Miron and CNA, in the amount of $3,419,697.29 for the cost to correct the baghouse. The "cost to correct the baghouse" figure is the sum of the cost that the panel determined would place CFU in as good a position as it would have occupied had the Contract been performed—$2,600,000—plus $748,659 in professional fees and $71,038.29 in arbitrator compensation and AAA administrative costs. In light of this figure, and the fact that Miron and CNA are jointly and severally liable with Dustex for $3,419,697.29, CFU argues that the court should enter judgment against Miron and CNA in the amount of $3,419,697.29.

Miron and CNA rely on Federal Rule of Civil Procedure 19 to support their claim that the court cannot confirm the award because Dustex is not a party to the instant action. Rule 19 provides that "[a] person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1). CFU, in turn, contends that, pursuant to federal law and Iowa Code section 613.1, Dustex is not a required party to the instant action. Iowa Code section 613.1 provides that, "[w]here two or more persons are bound by contract or by judgment, . . . jointly and severally, . . . the action thereon may, at the plaintiff's option, be brought against any or all of them." Iowa Code § 613.1. CFU also relies on the United States Supreme Court's analysis of Rule 19 in *Temple v. Synthes Corp.*, 498 U.S. 5 (1990), providing that

> [i]t has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit. . . . Nothing in the 1966 revision of Rule 19 changed that principle.

24

> . . . The Advisory Committee Notes to Rule 19(a) explicitly
> state that "a tortfeasor with the usual joint-and-several liability
> is merely a permissive party to an action against another with
> like liability."

*Id.* at 7 (quoting Fed. R. Civ. P. 19, 1966 Amended Advisory Committee Notes).

The court finds that Dustex is not a required party to this action. The court agrees with CFU that the Arbitration Award imposes joint and several liability on Miron and CNA for the full $3,419,697.29. In addition, the Arbitration Award holds Miron and CNA liable for $274,053.17 in liquidated damages and $33,439.63, the cost to complete automation of the ash conveyancing system. However, Miron and CNA's liabilities to CFU are offset by $420,872.96,[4] the unpaid balance that remains on the Contract. Accordingly, the court finds it appropriate to enter judgment as follows: (1) in favor of CFU and against Miron and CNA in the amount of $3,419,697.29, the cost to correct the baghouse, $274,053.17, the amount of liquidated damages, and $33,439.63, the cost to complete automation of the ash conveyancing system; and (2) in favor of Miron and CNA and against CFU in the amount of $420,872.96, the unpaid balance remaining on the Contract.

### B. Pre-Judgment Interest and Post-Judgment Interest

#### 1. Parties' arguments

In the Motion to Confirm, CFU requests that the court award "post-award interest at five percent (5.00%) per annum since November 6, 2013." Motion to Confirm at 4. In the Reply to the Resistance to the Motion to Confirm, CFU clarifies that it seeks "post-award (pre-judgment) interest at a rate of five percent (5%) as provided for by Iowa Code section 535.2 and post-judgment interest as provided for by 28 U.S.C. § 1961(a)." Reply to the Resistance to the Motion to Confirm at 3.

Miron and CNA contend that CFU is not entitled to post-judgment interest at a rate

---

[4] The Arbitration Award provides that Miron is not entitled to recover pre-judgment interest on this amount.

of 5%, but rather, at a rate of 2.12%, the Iowa statutory rate, as provided for in the Arbitration Award.[5] Furthermore, Miron and CNA assert that post-judgment interest does not begin to accumulate until November 17, 2013.

### 2.    *Analysis*

The Arbitration Award states that "Miron, CNA, and Dustex must pay this Award within ten days after the latest date this Award was signed by an arbitrator.  Interest shall thereafter accrue at the Iowa statutory rate."  Arbitration Award at 11.  The last arbitrator signed the Arbitration Award on November 6, 2013.  *See id.* at 12.  Accordingly, interest shall accrue at the Iowa statutory rate as of November 17, 2013, pursuant to the Arbitration Award.  According to the Iowa Code, this rate is 2.12%.  *See* Iowa Code § 535.3(1) ("Interest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13 . . . .); Iowa Code § 668.13(3) ("Interest shall be calculated as of the date of judgment at a rate equal to the one-year treasury constant maturity published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent.").  According to the State Court Administrator, this rate was .12% from October 2013 through December 2013.  *See, e.g.*, News Release, Notice of Treasury Constant Maturity Index for Calculation of Interest on Certain Judgments,  Iowa  Judicial  Branch,  (November  7,  2013), http://www.iowacourts.gov/For_Media/news_releases/NewsItem12/index.asp. Accordingly, the court is satisfied that the appropriate "Iowa statutory rate" of pre-judgment interest is 2.12% (calculated by adding 2%, pursuant to Iowa Code section

---

[5] It appears that Miron and CNA interpreted CFU's request for "post-award interest" as a request for post-judgment interest.  However, the court assumes that CFU is referring to pre-judgment interest when it uses the term "post-award" interest, or interest that will run after the Arbitration Award was issued, but before the court enters judgment.  In the Reply to the Resistance to the Motion to Confirm, CFU clarifies that it seeks pre-judgment interest at a rate of 5%, pursuant to Iowa Code section 535.2, and post-judgment interest at a rate pursuant to 28 U.S.C. § 1961(a).

668.13(3), to .12%, as provided for by the State Court Administrator). This pre-judgment interest shall begin to accrue as of November 17, 2013.

The court finds that CFU is also entitled to post-judgment interest on the amounts of $274,053.17, $33,439.63 and $3,419,697.29 and that Miron and CNA are entitled to post-judgment interest on the amount of $420,872.96. Post-judgment interest is calculated pursuant to 28 U.S.C. § 1961, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). Accordingly, the court shall award post-judgment interest at a rate of .12%, in accordance with 28 U.S.C. § 1961(a), to begin accruing on the date that judgment is entered. *See* Selected Interest Rates (Weekly) (February 25, 2014), http://www.federalreserve.gov/releases/h15/current/.

### C. Attorney's Fees and Costs

CFU requests that the court award CFU attorney's fees incurred over the course of the confirmation proceedings and assess costs against Miron and CNA. Miron and CNA contend that CFU is not entitled to attorney's fees and costs with respect to the confirmation proceeding because "[n]either statute nor the parties' contract authorizes an award of confirmation-related attorneys' fees." Resistance to the Motion to Confirm at 8. The court notes that CFU has since filed a Motion for Attorney's Fees and Costs (docket no. 23), requesting $69,116.50 in attorney's fees and $968.30 in costs. Accordingly, the court reserves ruling on this portion of the Motion to Confirm and shall address attorney's fees and costs pursuant to the Motion for Attorney's Fees and Costs.

### IX. CONCLUSION

In light of the foregoing, **IT IS HEREBY ORDERED THAT**:

(1)   Defendants and Counter Claimants Miron Construction Co., Inc. and Continental Casualty Company's "Motion to Vacate" (docket no. 19) is **DENIED**.

(2)   Plaintiff and Counter Defendant Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa's "Motion to Confirm" (docket no. 12) is **GRANTED IN PART**.   To the extent that Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa requests that the court grant attorney's fees and costs, the court **RESERVES RULING**.

(3)   The Clerk of Court is **DIRECTED** to enter judgment as follows:

(a)   In favor of Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa, and against Miron Construction Co., Inc. and Continental Casualty Company, jointly and severally, in the amount of **$3,419,697.29**, the cost to correct the baghouse.  As to this amount, pre-judgment interest shall accrue as of November 17, 2013, at a rate of 2.12%, pursuant to Iowa Code section 668.13(3).  Post-judgment interest shall accrue as of the date of this judgment at a rate of .12%, pursuant to 28 U.S.C. § 1961(a).

(b)   In favor of Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa, and against Miron Construction Co., Inc. and Continental Casualty Company, jointly and severally, in the amount of **$274,053.17** in liquidated damages.  As to this amount, pre-judgment interest shall accrue as of November 17, 2013, at a rate of 2.12%, pursuant to Iowa Code section 668.13(3).  Post-judgment interest shall accrue as of the date of this judgment at a rate of .12%, pursuant to 28 U.S.C. § 1961(a).

(c)   In favor of Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa, and against Miron Construction Co., Inc. and Continental Casualty Company, jointly and severally, in the amount of **$33,439.63**, the cost to complete automation of the ash conveyancing system.  As to this amount, pre-judgment interest shall accrue as of November 17, 2013, at a rate of 2.12%, pursuant to Iowa Code section 668.13(3).  Post-judgment interest shall accrue as of the date of this judgment at a rate of

.12%, pursuant to 28 U.S.C. § 1961(a).

(d)   In favor of Miron Construction Co., Inc. and Continental Casualty Company and against Board of Trustees of the Municipal Electric Utility of the City of Cedar Falls, Iowa in the amount of **$420,872.96**, the balance remaining on the Contract. As to this amount, post-judgment interest shall accrue as of the date of this judgment at a rate of .12%, pursuant to 28 U.S.C. § 1961(a).

**IT IS SO ORDERED.**

**DATED** this 26th day of February, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA